Good morning, Your Honors. California Deputy Attorney General Corey Robins for Respondent and Appellant. May it please the Court, I note at the outset, especially in light of the preceding argument, that I think Johnson also has some impact to this case. It was cited during the evidentiary proceedings, and I think it will be useful to see what that Court says. I'd like today to briefly address our argument that the Prima Facie case finding was legally incorrect under this Court's precedence, under Wade. Can I ask a question about that? Yes, Your Honor. Hernandez in the Supreme Court did say that if you get to the third stage, you don't go back to the first, which is consistent with Title VII law as well, discrimination law in general. Here, the State court didn't go beyond the first stage, but the district court did. Correct. Should we be going back to the first stage? Yes, Your Honor. Why? In Hernandez, the equivalent of a VATS in motion was made in the State court. And before the State court made any findings on it, the prosecutor offered his reasons and they were evaluated. That's almost like conceding or waiving that first prong. But that's not what Hernandez — that wasn't Hernandez's theory. Hernandez's theory was that ultimately the question here is, was there discrimination? The back-and-forth is simply a means of getting at that conclusion. And if we have a final conclusion in that regard from the district court after an evidentiary hearing, why are we going back to — suppose, for example, the State court had properly found there was no — we would think that they properly found there was no Prima facie case. However, the district court didn't think so and held a trial. Suppose the prosecutor had gotten up in the district court and said, you know, I really did do this for a racially discriminatory reason. Would we then go back to the question of whether the State court was correct, that there was no Prima facie case? Well, that's an interesting question. I think Hernandez could leave us all in the position where a patently erroneous Prima facie finding is insulated from appellate review. And I think that's the danger the Court's confronted with if it chooses to extend Hernandez to circumstances where there is a Prima facie case finding made, whether in the district court or the trial court, but then you go forward to have the reasons evaluated. And I think this case sort of illustrates that point. In our view, the Prima facie case finding is erroneous, but imagine, if you will, a circumstance where there should be a Prima facie case finding. And the trial court or the district court says, you know, I'm going to find there's no Prima facie case finding here, but I want to hear your reasons anyway. And the reasons are offered, and the trial court or the district court then says, you know, I'm going to accept those reasons. There's no problem under Batson. Now what that court has just done is shielded an erroneous, assuming it's erroneous, Prima facie finding by shunting the appellate review. You see, you're under the problem with your analysis is, and I said this, I think, more because of an understanding of how it operates in the employment cases, is that you're assuming that the Prima facie case finding is something other than an evidentiary way of advancing the inquiry. It isn't. It's simply a way the courts have set up to find the ultimate thing they want to find, which is, was the prosecutor operating, challenging people on the basis of race. And that's really what we have to worry about in the end. So it disturbs me to think that we're going to go back to this primary question when we have a whole record now in great detail as to why he actually did this. Well, I understand what Your Honor is saying. And what I think is that while that might work in a Hernandez-type situation, I think there's a great danger, and that is you can insulate a bad Prima facie ruling, and then you end up in a clearly erroneous type of review, which is a lot harder to get any relief under. You mean if the prior case could be seen that way. But that doesn't disturb me. It seems to me ultimately we want to know as much as we know, can know, before we make the decision. And although the district court may be able to cut it off, and if they cut it off, we can evaluate whether they cut it off. If they don't cut it off, or if the district court goes for it, it doesn't make sense to me to be going back to some prior evidentiary State where we know less than we actually know. That's a very peculiar way to operate. Well, I think Your Honor's right. We do want to know as much as we possibly can. But I was thinking about this a lot before coming to argument. You know, when I read the Stubbs case and I saw how that was handled. But I just think there's a great danger. I think it makes sense in a Hernandez-type of situation, but I think there's a competing policy. And I'd ask the Court to consider that when it considers this issue. And I think this case illustrates the danger in it. Here you had a prima facie case finding made on a sample size in part, well, on two prongs. The first prong was the statistical analysis, a sample size of three. And in Wade, this Court noted that a sample size of three is simply of very limited value. The second prong was the question that was asked. And as the district court found here, the question reflected the prosecutor's true concern that the prospective juror, number 9462, may have had a racial bias. Did he ask that question to white jurors? He asked that question of no other juror, not the other African-American juror. He didn't ask the white jurors whether they had racial bias. He also didn't ask any other African-American jurors the same question. And in fact, I think, you know, you look at Miller L., where you had disparate questioning. You had a pattern of it. But here you had no pattern. What you had was a juror, one particular juror, who had had problems that what the prosecutor considered were problems. She had two very close relatives who had been robbed and murdered within a couple of years before trial in separate incidents. In one case, the police never found the perpetrator. In the second, as she explained it, the perpetrator was caught and was doing a couple of years in jail and maybe had even been released. When she was asked how she felt about that, did she feel the police had done a good job, her response was, you know, yeah, you know, I guess they did. It was fair. But the prosecutor on the record before asking the question said, you know, the words you're using are going to appear on the record and they're going to say that you don't have a problem, but your facial expression indicates something different. I mean, let me tell you what's really bothering me about the prosecutor's explanations, really, aside from the question. He kept insisting after evidentiary hearing that this juror had some problem with the – to me, he totally misconstrued what – in a non-debatable way about what she had said about the hung jury. The 4042. Yes. Yes. I mean, he just was totally off in terms of any fair reading of what she had said. A, I wish you would at least agree with this, concede that, which you didn't in your briefs, and second of all, tell me, you know, what the significance of that is. Well, you're absolutely right. I was at the hearing and both the magistrate judge and I were confused by his response because earlier he had pointed out that he thought she didn't understand, and I think this is all reflected in the record, that she didn't understand the nature of the charges. And I thought that was borne out by the record. I think what happened is he just got confused when he was explaining that. But he said it over and over again. He kept saying she thought that they undercharged this case and she – and besides that, how could there have been a firearm in a vehicular manslaughter, which was obviously talking about two different charges. Well, I can explain that, which was what he had originally said. The juror was asked what number 4042 was asked what the charges in the Hung Jury case were. And she said, you know, one was vehicular manslaughter and the other was, I don't know, I'm paraphrasing her words, I don't know, it wasn't like attempted murder. It had a firearm. And then the trial judge said something to the effect of, was it a robbery? And she said, no, it was like an argument. And so the prosecutor's explanation, which I don't think is unreasonable in light of that, was, you know, she's got a case involving a firearm. She's not clear what it was and she says it was some kind of an argument that led to charges involving a firearm. Now, I don't think it's unreasonable for a prosecutor to say, you know, here's a juror who was involved in a Hung Jury over an argument which led to serious charges involving a firearm. What did she mean by that? Well, it's hard to tell for sure, but as the prosecutor, I think he was more than entitled to say, you know, there's a potential problem with this juror based on her confusion over the charges and the possibility that she's minimizing what they were and the suggestion that they were overcharged. That's what I had thought he was getting at, but I remember during the hearing, and I think Your Honor's aware of this, he appeared to get a little confused during his testimony. What was disturbing is that he got adamant and he seemed to be characterizing her as someone who was criticizing the police when there was just no grounds for that, or the prosecutors. Yeah. I think that he was legitimately concerned with these two prospective jurors based on the responses they gave that they might have had some sort of bias with respect to the police. I think that's what his concern was. Suppose we thought that at least with respect to one of them, there was absolutely no basis for that. What do we do with that knowledge? That's how we understand the record. Does that lead to support the conclusion that he was – had some reason to be getting rid of her, other than what he was saying, because what he was saying makes no sense? Well, I have a couple of responses. First, it depends at least in part on how the Court handles the prima facie issue. And I think it also depends on what Johnson does. But if you get into that, I'd point out to the Court that even a mistaken reason under this Court's jurisprudence – and I think we cited the authorities in our briefs – even a mistaken reason doesn't necessarily give rise to a Batson violation. You have to find it was a discriminatory reason. And I think given the types of answers and the way this juror presented herself, 4042, which I imagine would be the juror that Your Honor is referring to, I don't think anyone can say, based on the cold record, that it demonstrates discrimination. And I point out also, although I know Your Honor is well aware of the standards of review, and we won't go into those at all, and the trial court certainly did not like the question that was asked. I think that's clear from the record as well. But he didn't find that there was a problem with respect to Batson once the objection was made. In other words, he saw these jurors, he heard the answers they were giving, and he didn't have a problem. And he didn't say, you know, defense counsel, you're raising up a point, I need to weigh this well, you just don't come close. He just said, no, there's no showing. And what was the Batson motion based on at the time? It was after the striking of the second African-American juror of whom the prosecutor had asked the question. And that seemed to be the thrust of the motion. All right, counsel, you've exceeded your time. So thank you very much. Thank you very much, Your Honors. And let's see if we have any questions. Okay. Thank you. Good morning, Your Honor. Sean Kennedy on behalf of the appellee, Michael Thomas. May it please the Court. The problem with the State's argument is it's asking the panel almost to sit as a second trial court regarding the Batson violation. And the enormous emphasis on the prima facie case, it almost threatens to, this preliminary question, threatens to eclipse the real question, which are, what are the facts regarding the ultimate question of discrimination? And Magistrate Block, who actually heard the testimony, decided the facts were that the reasons offered were pretextual, and he had very good reasons for saying that. And he's the one who saw the demeanor of the prosecutor, heard him testify, and asked him probing questions, and heard his responses. Ultimately, Batson, as all the members of the Court know, is a question that rests on credibility and factual issues. And we've had a hearing now, and the magistrate and the district court found that step three, intentional discrimination, had been proven by Mr. Thomas. I don't... Kagan.  I'm not sure if the answer that I asked previously, what do we do with the – suppose we thought that the district court was wrong about the State court being wrong, at least applying an APRA standard with regards to the prima facie case. What do we do about that now that we've had the evidentiary hearing? The habeas context puts a twist on it, it seems to me, that may result in a different answer from Hernando's, because if the State court was right in the first place, or at least was done reasonably wrong in the first place, about there not being a prima facie case, then do we go look at the reasons that were given, or do we say, forget it, the State was entitled to deference, even if we now know, even on the current record, we would find otherwise? It's a very peculiar situation. Well, it's troubling, because what the argument is really that we've had a hearing, the facts have been revealed, and the State is asking this court to close its eyes to the reality of what's been proven based on a preliminary question, and invoking AEDPA as the basis to do that. I suppose that could happen fairly frequently under AEDPA, because if the State court, in other contexts, erroneously held an evidentiary hearing for whatever reason, because they should have just relied on the State court facts, we could have that same problem. It's a very troublesome one, but I'm not sure it's peculiar to this situation. Well, I think that's right. I think that's fair. But, you know, Miller L. was an AEDPA case, and the State originally found no prima facie case. And in Miller L. 1, I know that Miller L. 2 is still before the High Court, but in Miller L. 1, there was no problem with ordering an evidentiary hearing after the trial. So I think that the notion of this preliminary question is greatly overemphasized, and it's done for a reason. And the reason is because, ultimately, the State lost in the only court that heard the facts regarding this issue. And really, Your Honors, the questions are deeply related. The reason it lost on Step 3 is the reason it ought to lose under Step 1. And the law on prima facie case is well-established, I think, and I know that there's a ---- Well, this one was a very weak case on numbers, it seems to me. I mean, certainly the numbers you could ---- It was. If the racial questioning hadn't occurred, I assume you'd be out of luck in terms of a prima facie case. I don't know. I think that the racial question is compelling and powerful evidence of discrimination, but it certainly isn't the only ---- No, I understand that. But I'm saying if it hadn't occurred and all you had was that two out of three black jurors were challenged, I think you'd ---- given the very low numbers of challenges and so on, you'd have a hard road to hop. Yes. So, therefore, a great deal turns on the racial questioning in terms of both the prima facie case and the ultimate determination. That's true, and I think it should turn on that, because even in the state court, who found there was no prima facie case, in my view, because of a misunderstanding of Batson's law on that, and Batson was reiterated in 2003 in Miller L, but the judge himself, the state judge in the trial, observes regarding the question. The district attorney says, well, I think putting it out on the table is the right thing to do, and I've done it before, and this is why I'm doing it, and it's a fair question. And the judge who found no prima facie case because of a misunderstanding said, well, I doubt that it's fair. So even a state court fact finder has weighed in, and it supports what the district court did here, because Judge Hogwarts said it wasn't a fair question either. And so we go to the prima facie case, and I just would like to briefly correct the ---- I would argue as a misinterpretation or misperception of evidence, it's not just a low ---- it's not just a statistic based on a low number sample. Two out of three of the peremptories are exercised against African Americans, but that's not all there is. There is disparate questioning, as the Court already observed. This question is asked of an African American woman and nobody else, and we understand from statements made at the sidebar and now that it's not the first time he's singled out an African American juror to ask this question. He's done it before, and certainly pattern evidence is traditional. Also when we take the first strike against an African American juror, she's on a hung jury and apparently has questions about the police or had problems with the police in the prosecutor's view, but we have a white man who's on a hung jury and was convicted of a wet reckless and said straight out, unambiguously, that he didn't like the way it was handled. What happens with him is he treated with these questions about, well, your body language says one thing, but your mouth says another. No, he's rehabilitated. Time is spent rehabilitating him. Disparate rehabilitation is also significant evidence in establishing a prima facie case. And the resort to these body language images like she doesn't smile at me, she has an attitude, I would just like to point out almost 20 years ago in Batson, Justice Marshall predicted that the problem of overemphasizing prima facie case, he concurred in Batson, but he said it's very deferential to prosecutors and we have to be careful. And he specifically referred to and predicted, quote, breaking a smile, refusing to break a smile would be used as justifications that then are presented to the court and are very difficult for an appellate panel to evaluate because none of us, I wasn't at the hearing, none of us were there, but the judge who heard the evidence was there and he was very skeptical of the answers that were offered. And that's where I move to step three, which is step three is very important and that's why I believe the court in Hernandez made the point about once you've gone to the ultimate question, it really moves to the preliminary question. It really ought to be that way. I mean, the truth is what is the most important part of assessing a Batson violation. What truly happened in the court? What is the prosecutor actually doing? Yes, there is a preliminary or a threshold thing to try to keep it under control, but once we have had the prosecutor and he said he wanted to give his reasons, he was glad that this hearing was held, he wanted to, quote, look everybody in the eye and explain his position. He did that. He had that opportunity. After the evidence was closed, Your Honors, he went to the attorney general apparently and asked that the evidence be reopened so that he could respond to further questions that the court had raised, and Judge Block allowed that to happen and he gave further evidence. In light of that, it seems that it would be a waste of judicial resources and a real affront to Batson and Miller, L. Well, what do you think the prosecutor said very briefly at that, what, the first or the second question of his motives? I'm sorry, Your Honor, what did he say? Because so far you've been telling us about the record before the State court, but what at the district court hearing did the prosecutor say that you think supports the conclusion? I didn't mean to speak over the Court. He explained all of what he saw as rational. He explained why he disparately rehabilitated a white juror and not a black. He explained why he attached so much. I want to know why you think what he explained supports your position. Oh, because I think, as the Court found, it didn't ring true. It sounded untrue. The explanations didn't make sense. When you looked at the record, they weren't supported by the record. When he was caught in problems, he had no real answers. And that's the importance of Step 3. That's the importance of the hearing. The truth of the matter was revealed. His credibility was in question, and the Court found that he was not credible. I see that my time has expired, so I would respectfully ask the Court to affirm the district judge's opinion. All right. Thank you, counsel. Thomas B. Rowe is submitted, but again, we may ultimately decide that we have to defer to Johnson. Thank you, Your Honor. Thank you. All right. We'll take up Mortenson v. Navely.
judges: Wardlaw,berzon, Fitzgerald